**UNITED STATES of America**

v.

**Federico GIOVANELLI, a/k/a "Fritzy," Steven Maltese and Carmine Gualtiere, a/k/a "Buddy," Defendants.**

**No. S 88 Cr. 954 (CBM).**

United States District Court,
S.D. New York.

July 30, 1989.

Benito Romano, U.S. Atty., S.D.N.Y. by Adam S. Hoffinger, J. Gilmore Childers, Asst. U.S. Attys., New York City, for U.S.

Lawrence Hochheiser, Hochheiser & Aronson by Vivian Shevitz, Georgia J. Hinde, New York City, for defendant Federico Giovanelli.

Ira S. Cooper, Zerin & Cooper by Ira S. Cooper, Neil Rothfeld, New York City, for defendant Steven Maltese.

Robert M. Baum, The Legal Aid Soc., Federal Defenders Services Unit by Roland Thau, Robert E. Precht, New York City, for defendant Carmine Gualtiere.

OPINION

MOTLEY, District Judge.

On July 11, 1989, New York City Police Detective Gaetano Bruno was called as a defense witness in this case by all three defendants. While on the witness stand, Bruno was asked about a description that was given to the police by Frank Simone, an eyewitness to the murder of deceased Detective Anthony Venditti and the attempted murder of Detective Kathleen Burke. Bruno was questioned by defense counsel for defendant Maltese about a short or a waist length green bomber jacket allegedly worn by male shooter number two, alleged to be Maltese. Although Frank Simone had not yet testified and although Bruno testified that when he focused on defendants Maltese and Gualtieri as suspects in the shootings, he did not have the written police report (DD5 No. 15, which did not even exist on the night of January 21, 1986) containing Frank Simone's descriptions of the shooters, all defense counsel made a relentless effort to elicit from Bruno the descriptions contained in that particular police report. This effort was made notwithstanding repeated objec-

tions by the Government and notwithstanding repeated rulings by the court that neither the DD5 nor its contents was admissible in evidence, since it was a police report containing hearsay specifically barred by Rule 803(8) of the Federal Rules of Evidence.

Defense counsels' persistence resulted from the fact that they were reluctant to put Frank Simone on the witness stand as their witness since he was an admitted drug and alcohol abuser and had recanted, under suspicious circumstances, his testimony on a prior state court trial as to the presence of Gualtieri at the scene of the crime and the fact that the Government had declined to call Simone as their witness. Simone, however, was subsequently called to testify as a defense witness in the case, whereupon descriptions given by him and contained in the DD5 at issue, which defense counsel had feverishly tried to elicit through Detective Bruno, were in fact elicited through Simone. Thus, through Simone's testimony concerning the descriptions he gave the police on the night of January 21, 1986, defense counsel were fully able to espouse their position that the police and Detective Bruno had "unreasonably deviated from [their] own standard," *July 12 Transcript*, p. 7611, in focusing on defendants Maltese and Gualtiere, since the DD5 descriptions, according to the defense, did not match those of the two defendants.

On July 11, 1989, while on the stand, Detective Bruno was given a large booklet containing numerous police reports, which included Simone's descriptions, by Mr. Cooper, defense counsel for defendant Maltese, so that his *recollection could be refreshed* as to how he came to focus on Maltese as a suspect, July 11, 1989 *Transcript*, p. 7554, [hereinafter referred to as *July 11 Transcript*]. The court informed the witness Bruno that he was not to testify about the contents of the document (the DD5) but only about his refreshed recollection as to what basis he had for narrowing the number of suspects down to five. *Id.*

Rule 803(8) of the Federal Rules of Evidence, excepts from the the hearsay rule, the following:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel....*

The document contained in the booklet shown to the witness Bruno, DD5 No. 15, was a report containing matters observed by law enforcement personnel and, therefore, is excluded, as inadmissible hearsay, from the scope of Rule 803(8).

In addition, Rule 612 of the Federal Rules of Evidence also excludes such document from evidence. According to Rule 612, *"[e]xcept as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code,* if a witness uses a writing to refresh memory for the purpose of testifying ... an adverse party is entitled to have the writing ... introduce[d] in evidence...."* The document at issue, DD5 No. 15, is a document in the same category as 3500 materials, and therefore is also excluded from the scope of Rule 612 of the Federal Rules of Evidence. Because this document is a police report containing statements of prospective witnesses, the Government has treated DD5 No. 15, as well as other police and FBI reports in the case, as 3500 materials which were turned over to defense counsel when the witness whose statement is contained in the report testified at trial.

The court, therefore, excluded descriptions contained in the document and instructed the lawyers not to elicit such descriptions from the witness Bruno who was being shown the document only to refresh his recollection. After going through the transcript of the testimony of Detective Bruno in order to clarify the record at the suggestion of defense counsel Roland Thau who represents defendant Gualtiere, the court concludes that defense counsel, in contravention of the court's instructions, repeatedly tried to get the witness to testify about the description contained in the

DD5 and to pin the witness to such description in testifying as to his refreshed recollection in order to get before the jury Simone's descriptions of the alleged shooters without having to put Simone on the witness stand. Since the conduct of defense counsel with respect to the use of police reports during the examination of Detective Bruno was characteristic of their conduct throughout the trial with respect to the use of such reports, this opinion will lay out the court's observations of incidents related to the examination of Detective Bruno, in which defense counsel, under the guise of refreshing the detective's recollection, refused to accept the detective's testimony about his refreshed recollection and, instead, attempted to elicit from him hearsay information contained in the DD5 description. As the following page-by-page examination of the record shows, this course of conduct was consistently followed by defense counsel, even after the Government repeatedly objected and even after the court repeatedly sustained the Government's objections. This strategy on the part of defense counsel resulted in confusion on the part of the witness and an inability on the part of the court reports to accurately transcribe the testimony of Detective Bruno.

*Mr. Cooper's Examination of Detective Bruno*

Mr. Cooper asked the following question of the witness: "Can the witness tell us, now that his recollection was refreshed, *what the description was* as it pertained to Mr. Maltese?" *July 11 Transcript*, p. 7556 (emphasis added). Even though the Government objected, Mr. Cooper continued to ask Detective Bruno for the description contained in the DD5. Referring to Frank Simon's description, Mr. Cooper asked Detective Bruno, "And what was that description?" *July 11 Transcript*, p. 7557. After the court rephrased the question so that Detective Bruno would not be asked to testify about a description contained in a document not in evidence, the question that was asked by Mr. Cooper was reformulated to the following: "What name did you come up with?" *July 11 Transcript*, p. 7557. Detective Bruno answered, "I came up with Steve Maltese." *Id.* Mr. Cooper continued, "And what was the description that caused you to come up with Maltese?" *Id.* Detective Bruno replied, "Basically, salt and pepper hair and a green jacket." *Id.*

Apparently not satisfied with Detective Bruno's answer, even though Bruno was his own witness, Mr. Cooper proceeded to ask Detective Bruno to "look at the No. 3 [in Frank Simone's DD5 description] again." *Id.* The Government objected, stating that there was no reason to show the detective the book containing the report again, since the detective had already used the book to refresh his recollection before he answered Mr. Cooper's question. Mr. Cooper persisted: "Would you please look at the document again and see if your recollection was refreshed properly as to the color of the hair." *July 11 Transcript*, p. 7558. After the record was reread and after the court agreed with the Government that Detective Bruno had already looked at the DD5 and had not requested to look at it again, *July 11 Transcript*, p. 7559, Mr. Cooper tried the same question, in a different form, again. "When you looked at it [the report] briefly, do you believe that Mr. Maltese had curly black hair on January 21, 1986?" *July 11 Transcript*, pp. 7559–7560. The Government immediately objected, and the court sustained the objection. Ignoring the court's ruling, Mr. Cooper continued: "Does it refresh your recollection—do you think now on January 21, 1986, Maltese had curly black hair?" *July 11 Transcript*, p. 7560. The court interjected: "I sustained the objection."

Mr. Cooper was obviously trying to get the witness to limit his refreshed recollection to what is contained in the document so that Mr. Cooper could then argue that the witness' testimony is not in synchrony with the description contained in the document not in evidence. The purpose of using a document to refresh a witness' recollection is not to circumscribe the witness to the description contained in the document but to allow his memory to be refreshed, *whatever that memory may be.*

Whether or not the document may or may not contain a description about curly black hair is not the issue. The issue is simply that after having looked at the document to refresh his recollection as to what description caused the witness to come up with the name Maltese (whether that description was contained in the report or not, or whether that description was jogged *from the witness' memory* as a result of having looked at the report), the witness testified that it was a description about salt and pepper hair that lead him to Steven Maltese. The witness' refreshed recollection is not limited to whatever description is contained in the report. There is no requirement that what motivated the witness to focus on the name Maltese had to match the description contained in the report. The witness was not asked to read what was in the report but to use the report to refresh his recollection, and Mr. Cooper's persistent attempts to impeach the witness by referring him back to the description in the report, by showing that his answer was not consistent with Simone's description contained in the report, was improper. This is not an instance of impeachment by prior inconsistent statement.

In another instance, Mr. Cooper asked the following question of Detective Bruno: "Is there anything else in there which caused you to come up with the name Steven Maltese? Is there anything else?" *July 11 Transcript*, p. 7562. Detective Bruno answered, "Just a husky build. That's all." *Id.* Mr. Cooper then added this question, "There's nothing about salt and pepper hair, is it?" *Id.*

Once again, not satisfied with the answer the witness gave him ("husky build"), which the witness answered after refreshing his recollection with the document shown him, Mr. Cooper injected his own quasi-editorial remark to try to force the witness to the contents contained in the four corners of the document. Mr. Cooper's comment ("There's nothing about salt and pepper hair") is another attempt to get the witness to testify to what description was included, and what was not included, in the document. Clearly, Mr. Cooper's

real purpose in showing the witness the document was not to use it as an aid to refresh the witness' recollection as to what *motivated* the witness to come up with the name Maltese, but to try to elicit, through the witness, a third party's information and description contained in the document itself. The repeated attempts to impeach the witness' memory and recollection with descriptions in a report, as though the witness had been asked to read or testify from the report (which he was not), were improper.

The exact same sequence of events was soon repeated. Referring to a green jacket, Mr. Cooper asked Detective Bruno, "That's what motivated you the most, is that correct?" *July 11 Transcript*, pp. 7564–7565. Detective Bruno answered, "Green jacket, husky build, yes." *Id.* at 7565. Mr. Cooper once again attempted to freeze the witness' recollection only to what was or was not in the document and inserted his own comment to the witness' answer: "Nothing about salt and pepper hair in that description." *Id.*

The court, recognizing what Mr. Cooper was trying to do, said, "You are again reading into the record what the document says, not what he answered. The question to the witness was not what the document said. The question to the witness was what caused the witness...." *July 11 Transcript*, p. 7565. After interrupting the court, Mr. Cooper proceeded to ask the same question, only this time, he attempted to cure its blatant impropriety by adding the phrase "refreshed your recollection": "Now that you've looked at that DD5 again, and you refreshed your recollection ... there was nothing that motivated you to come up with the name of Maltese about salt and pepper hair, isn't that correct? Yes or no." *July 11 Transcript*, p. 7566.

The purpose of showing the document to the witness, as the court repeatedly and vainly, tried to instruct Mr. Cooper, was *not* to ask the witness whether there was or was not a *particular* description *contained in the document* that motivated him to narrow the list of suspects down to the name Maltese. The witness was testi-

fying from his own independent refreshed recollection, not reading from the document.

Paradoxically, it was this precise distinction that lawyers for the defense had questioned numerous government witnesses on. For instance, whenever police detectives and F.B.I. agents used a report that they had authored to refresh their own recollection, they were invariably asked by defense lawyers, who were eager to show that the officers lacked sufficient memory and needed to rely on their reports, whether they were testifying from their own recollection which had been triggered by a reading of the report, or whether they were simply reading from the report because they had no memory of the events about which they were testifying. Interestingly enough, when Detective Bruno testified from his own recollection as to what motivated him, after refreshing his recollection with the report, the defense lawyer, Mr. Cooper, wanted him to testify from the report instead, rather than allow him to rely on his own refreshed memory. When it came to Detective Bruno, Mr. Cooper was apparently unable to make the distinction between refreshed recollection and past recollection recorded, in this case, someone else's (Simone's) past recollection recorded.

The court should note that the persistent attempts, by both Mr. Cooper and Mr. Thau, to get Detective Bruno to read the descriptions written in the document is all the more improper, given the fact that Detective Bruno, on the night in question, had not received any written description of suspects. Mr. Thau specifically asked Detective Bruno this question: "And in order that you should better remember, or not forget, what they were, you were given those in writing or you wrote those yourself, right?" *July 11 Transcript*, p. 7569. Detective Bruno replied, "Basically was word of mouth at that point. I did not write it down." *Id.* Mr. Thau continued, "Did there ever come a time before you focused on five specific men, that you wrote these descriptions or someone gave you a written version of them?" *Id.* Detective Bruno answered, "I did not write

them, and I don't believe I was given any paper with their descriptions on it." *Id.*

*Mr. Thau's Examination of Detective Bruno*

Like Mr. Cooper, Mr. Thau also attempted to elicit, through Detective Bruno, descriptions contained in the DD5. Detective Bruno was asked the following question by Mr. Thau: "Now, that description which found Mr. Gualtiere as a candidate is a man, male white, five six to five seven in height?" *July 11 Transcript*, p. 7572. The Government, thereupon, objected, and the court sustained the objection. *Id.* Mr. Thau nonetheless continued trying to draw the witness to the content of the document, asking him, "Is the weight stated there?" *July 11 Transcript*, p. 7573. After telling Mr. Thau that that was not a proper question, the court rephrased the question to, "... What motivated you?" *Id.*

Like Mr. Cooper, Mr. Thau tried to ask the witness about what was or was not stated in the report, although, as the court repeatedly instructed both lawyers, the purpose of showing the witness the report was not to ask him to testify as to what was included in or omitted from such document, but simply to refresh his recollection. Thus, what was or was not in the report was not relevant to the witness' testimony as to his recollection. As the court explained above, the fact that the witness' testimony, after refreshing his recollection, is not matched by the contents of the report does not mean that the witness was lying, as Mr. Thau had accused. *See July 13, 1989 Transcript*, p. 8142 ("... the witness Bruno committing rank perjury....."). Referring to the events of July 11, 1989, when Detective Bruno was being questioned by Mr. Thau, Mr. Thau stated that Detective Bruno had falsely testified about the descriptions contained in the DD5. *See July 17 Transcript*, p. 8325 (Statement by Mr. Thau, "And then [Detective Bruno] said—it says here—and I remember vividly, because it struck me, because it didn't say here 'a tan jacket.'").

The court's examination of the record reveals that Detective Bruno was given the

following instruction by the court, "No, I'm asking you what motivated you, not what it says in there." *July 11, 1989 Transcript*, p. 7574. Detective Bruno responded in the following way, "My own would be male bald about—it says 50 to 60, and also it says, with a tan jacket on, about five seven." *Id.* While the record does show that Detective Bruno did say "it says, with a tan jacket on ...," suggesting that he was saying that the report contains such a description, the court believes that 1) Detective Bruno was clearly and genuinely confused by the salvo of questions directed at him[1], 2) that Detective Bruno's answer was in itself confusing, because it appeared that the first part of his answer, the part which would be responsive to and in accordance with the court's instruction, was not completed by him ("My own would be male bald ..."), 3) that the confusion derived from the convoluted and disjointed nature of the proceeding itself, due to Mr. Cooper's and Mr. Thau's persistent refusal to abide by the court's ruling, forcing the Government to continually object to defense counsel's improper questions, so that the atmosphere in the court room was one of "unbelievable happenings" as even Mr. Thau himself admitted, (*see July 13 Transcript*, p. 8141), and 4) that Detective Bruno was directed to, not one single report, but rather, a book of reports containing multiple DD5s, of which DD5 No. 15 was only one of many such documents.

Therefore, in response to accusations that Detective Bruno was lying, *see e.g., July 13 Transcript*, p. 7854, the court suggested that perhaps Detective Bruno had been confused by the lawyers' questions, *July 13 Transcript*, p. 8142, because the detective had been handed a book containing, not one document, but multiple documents, from which to refresh his recollection, *see July 17, Transcript*, p. 8313 (question by the court to Mr. Thau, "Now, with respect to that, that particular document as I recall was contained in a volume of some kind, is that it?"; "Well, the point I want to make is, that that booklet, that Mr. Cooper

has in his hand—I call it a volume, it's DD5[2], his copy is between two hard covers, is the document which I thought the witness had in his hand at the time you were examining him." *July 17 Transcript*, p. 8325). Mr. Thau represented to the court that Detective Bruno was only given *one* single document, not a book of document. *See July 17 Transcript*, p. 8314 (answer by Mr. Thau, "I believe he did [have the book] when Mr. Cooper examined him. When I examined him he did not. I handed him one single piece of paper, which was my copy of the DD–5." *See also id.* at 8325–26). After rereading the record, however, the court believes that Detective Bruno was in fact holding Mr. Cooper's book of documents when being questioned by Mr. Thau. Thus, the witness' confusion as to what was or was not in which document, among all the documents in the book, could be seen in that light. *See July 11 Transcript*, p. 7573 (Question by Mr. Thau: "Would you look at DD5 that you've got *in that book* in front of you. Will you, please.") [emphasis added]; (instruction by the court: "I put the question to him [the witness] which was, after looking at that, does it refresh his recollection as to what motivated him to come up with the name Gualtiere.... And that's what he was telling us. Not what it says *in the book.*" *July 11 Transcript*, p. 7575 [referring to the book in front of the witness]).

Given the record above as the court had just recited, the court does not believe that Detective Bruno's reply, consisting of two and a half lines in the July 11 transcript book, could be characterized, as done by Mr. Thau, as either perjury or "bald-faced lies" *July 12 Transcript*, p. 7613. When Mr. Thau subsequently asked the detective about the role "the clothing of the man" played in motivating the detective to focus on Mr. Gualtiere, *see July 11 Transcript*, p. 7585, the detective responded that it was a tan coat that he had seen Mr. Gualtiere in numerous times, not that it was a tan coat as described in the report. *Id.* *See also infra* Opinion, p. 14. The court thus fur-

---

**1.** This discussion about the witness' confusion took place outside the presence of the jury.

**2.** Should read: "DD5s."

ther concludes that Detective Bruno's previous answer which Mr. Thau had deemed to be a lie, was simply an innocent mistake on the detective's part.

Like Mr. Cooper, Mr. Thau also showed the document to the witness, under the pretense of having the document refresh the witness' recollection. And like Mr. Cooper, instead of accepting his testimony as to the witness' refreshed recollection, Mr. Thau disregarded the witness' memory and instead attempted to force the witness to relate his memory back to the contents of the document: "And your memory about that description is now consistent with what you used to refresh it, is that correct?" *July 11 Transcript*, p. 7576. The Government objected, and the court sustained the objection because the purpose in showing the witness the document was not to ask him about the description contained in the document but only to help the witness refresh his memory about the description in question, whether or not that memory is consistent with what the witness used to refresh it.

On page 7585 of the July 11 transcript, Mr. Thau asked Detective Bruno about whether the "clothing of the man described play a role in your focusing on Mr. Gualtiere?" Detective Bruno answered, "The tan coat, as I remember, I seen [sic] Mr. Gualtiere in a tan coat numerous times." *July 11 Transcript*, p. 7585. Mr. Thau continued: "What kind of tan coat have you seen him in?" *Id.* Detective Bruno answered, "Short." *Id.* Mr. Thau then asked, "How short?" *Id.* Detective Bruno replied, "An Eisenhower jacket, as used and been called." Apparently unsatisfied with the answer, Mr. Thau proceeded with this question, "But that wasn't the description you were working from, was it?" *July 11 Transcript*, p. 7586.

The Government had to once again object, and the court once again sustained the objection. Mr. Thau was clearly trying to imply that the witness' recollection of a tan Eisenhower jacket, which he testified was what motivated him to focus on Mr. Gualtiere, was not consistent with the description in the DD5. But there was no requirement that it had to be consistent, or that if it

were not consistent, that the witness must be reading from the document and lying about its content. Detective Bruno was not responding that the DD5 contained the description of a short, Eisenhower jacket, only that he had seen Mr. Gualtiere in such a jacket on numerous occasions.

Mr. Thau, nonetheless, in direct contravention of the court's repeated rulings, tried to get the description contained in the document into evidence: "Detective, is it clear—it doesn't make sense, logically, that before we focused on what you took into account, that is,—, yes on the features, the characteristics, the details that you took into account in focusing on Mr. Gualtiere, we ought to settle *what that description actually said.* That makes sense to you, doesn't it?" *July 11 Transcript*, p. 7587.

The Government objected. The court immediately sustained the objection.

In response to Mr. Thau's continuing concern with the testimony of Detective Bruno, *see July 13 Transcript*, p. 7854, whom Mr. Thau believed had "lied on the stand" *id.*, the court advised all lawyers that for the purpose of clarifying the record, as to what motivated law enforcement on January 21, 1986 to pare down the list of suspects to include defendants Maltese and Gualtiere, Lieutenant John O'Brien could be called to testify in the case. *See July 13 Transcript*, p. 8161. As the court explained, defense counsel had not intended to put Lieutenant O'Brien on the stand because counsel had thought that Detective Bruno, who was in court during the course of the trial, would suffice. *July 17 Transcript*, p. 8361. When Lieutenant O'Brien, supervisor of police personnel of the Joint Organized Crime Task Force, was called by defense counsel on July 17, 1989, he testified that on the night of January 21, 1986, "bits and pieces of information, some of which concerned descriptions of the shooters" were received by him. *July 17 Transcript*, p. 8373. Lieutenant O'Brien stated the following: "What I do remember is that through the course of the night I received much information, and I had a picture *in my own mind* of the information as I put it together." *July 17 Transcript*, p. 8374 [emphasis supplied]. Moreover, like Detective Bruno, Lieutenant

O'Brien also testified that there was no written report at all on the night of January 21, 1986 at the 104 Precinct. *July 17 Transcript*, p. 8376.

*Mr. Hochheiser's Examination of Detective Bruno*

Like Mr. Cooper and Mr. Thau, Mr. Hochheiser, counsel for defendant Giovanelli, also attempted to elicit the contents of the document under the theory that it "is not hearsay. It's something that he adopted. He didn't invent everything in the world. He adopted as his own work product." *July 11 Transcript*, p. 7596. As such, according to Mr. Hochheiser, "the statement itself, the description itself in DD5, No. 15, would have been past recollection recorded simply because this witness testified that although it wasn't his, he had adopted it." *Id.* at 7597. The court does not believe that the rule dealing with recorded recollection, Rule 803(5) of the Federal Rules of Evidence, would allow admission of such document under the theory espoused by Mr. Hochheiser.

Rule 803(5) allows the admission of a "memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." First, there is no evidence to indicate that the witness had insufficient recollection concerning a matter about which he once had knowledge. The witness was fully able to testify, after his memory was refreshed by the report at issue. The fact that his refreshed memory did not coincide with the description contained in the report does not mean that the witness had insufficient recollection. Second, the witness had already testified that the report was not even in existence at the time of the night of January 21, 1986, and that there was nothing in writing at that time. The "memorandum or record" therefore could not have been made by the witness, nor adopted by the witness at the time at issue, when the matter was fresh in the witness' memory.

The court's examination of the record reflects that defense counsel had been given ample opportunities to present their theory of the case concerning the identification by Simone contained in the DD5 No. 15.

*Conclusion*

The record is clear that Mr. Cooper and Mr. Thau consistently and repeatedly disobeyed the court's rulings. The above page-by-page examination of the record reveals that the two lawyers continued in the same improper course of conduct, even after clear instructions from the court not to elicit, directly or indirectly, from Detective Bruno, what descriptions were contained in the document contained in the book shown to the witness. It is not disputed that all of the documents in the booklet and the single document Mr. Thau had in his hand when examining Detective Bruno were police reports containing hearsay statements by third parties who claimed to be eyewitnesses to the shooting of Detectives Burke and Venditti and that these reports were not available to Bruno on January 22, 1986, the day he focused on Maltese and Gualtiere as suspects.